IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

GEORGE HIGHTOWER, and
HIGHTOWER FOODS, L.L.C.                                    **PLAINTIFFS**

**v.**                            **CIVIL ACTION NO. 1:10CV166-SA-DAS**

**ARAMARK CORPORATION**                                   **DEFENDANT**

<u>**MEMORANDUM OPINION**</u>

Presently before the Court is a Motion for Summary Judgment [41] filed by Defendant Aramark Corporation.  After reviewing the motion, responses, rules, and authorities, the Court finds as follows:

<u>**BACKGROUND**</u>

This dispute arises from a leasing agreement for a Subway franchise between Plaintiffs George Hightower and Hightower Foods ("Plaintiffs" or "Hightower") and Mississippi State University ("MSU").  Plaintiffs contend that Aramark Corporation ("Defendant" or "Aramark"), the company selected by MSU to manage campus dining services, tortiously interfered with the leasing agreement at issue.

In 1993, MSU leased space in Colvard Union to Subway Real Estate Corporation for the purpose of operating a Subway restaurant.  This property was subleased to Lee Jabob, a Subway franchisee.  In 2003, Jacob assigned his sublease to Plaintiff George Hightower, who took over the operation of the Subway restaurant in Colvard Union.  Also in 2003, MSU apparently started planning to renovate Colvard Union and, because of this, MSU and Subway Real Estate Corporation signed an amendment to the leasing agreement on October 3, 2003.  The amendment recognized MSU's intent to renovate, providing that MSU could close

Colvard Union for renovations after providing six months written notice to Subway. This amendment also offered Subway Real Estate Corporation four additional one-year options to lease the space, with the first option to commence on May 17, 2005 and expire on May 16, 2006, and the final option to expire on May 16, 2009.

In October 2005, MSU informed Hightower via written letter that it wished to terminate the leasing agreement effective April 1, 2006, due to impending renovations to Colvard Union. MSU offered Hightower the availability of a temporary location to operate during the renovations. MSU additionally requested Hightower's contact information in order to send him a Request for Proposal ("RFP") if MSU decided to re-bid for food court vendors. In November 2005, Hightower requested a temporary location as had been offered and, subsequently, MSU proceeded with renovations to Colvard Union and Hightower began operating Subway out of a mobile unit in August 2006.[1]

On November 9, 2006, MSU announced that it planned to utilize a management services company to operate its campus dining sources. According to Plaintiffs, Bill Broyles, MSU's Assistant Vice President of Student Affairs–apparently acting without knowledge of the amendment to Hightower's leasing agreement–informed Hightower that he would no longer be permitted to return to Colvard Union. Subsequent to this, MSU issued a public invitation to negotiate, seeking proposals from companies that could provide campus dining management services. This invitation to negotiate mentioned MSU's current food service

---

[1] According to Plaintiffs, in anticipation of "a return and continued lease with MSU, Hightower spent over $70,000.00 in renovating a modular unit for a temporary location at MSU's request."

locations and identified several food locations excluded from the contract; however, the Subway restaurant operated by Hightower was not mentioned in the invitation to negotiate.

Defendant Aramark submitted proposals to MSU in response to MSU's public invitation to negotiate.[2] In January 2007, MSU selected Defendant to operate its dining services. Shortly thereafter, and also in January 2007, Bill Broyles informed Hightower that he had only recently learned of the October 2003 amendment that gave Subway the option to renegotiate the rental rate and return to Colvard Union upon completion of the renovations. After learning of this amendment, MSU appears to have engaged in discussions with both Hightower and the Defendant.

First, in February 2007, MSU informed Defendant Aramark of the amendment to the Subway leasing agreement. According to Defendant, MSU asked if Aramark's proposal would change if Subway returned to Colvard Union. Defendant alleges it asserted that, while its financial proposal might change, Subway's return would not be a "deal breaker." Next, MSU entered into discussions with the Plaintiffs concerning the discovery of the amendment. Defendant asserts that Bill Broyles and Don Buffman, MSU's Director of Procurement, invited Hightower and Paul Bisbee, Subway's Development Agent, to negotiate a new rental rate—pursuant to Section 4 of the amendment—if Subway elected to return to Colvard Union until May 16, 2009 (i.e., until the expiration of the lease).[3] Hightower, however, did not agree

---

[2] It is undisputed that other companies also submitted proposals to MSU.

[3] The parties appear to have met in either February or March of 2007 to discuss Subway's potential return to Colvard Union. This meeting appears to have taken place **before** the execution of the management services contract between MSU and Defendant.

to the rental rate or the terms proposed during the meeting.[4]   Apparently, MSU was subsequently notified by Paul Bisbee that Subway was electing not to return to Colvard Union.   Thus, on March 29, 2007, Subway Real Estate Corporation's attorney, Michael Donahue, sent MSU a "proposed lease termination" for the termination of the lease agreement.   However, it appears that Hightower refused to sign the termination agreement and, instead, Plaintiffs opted to file a lawsuit against MSU for breach of the October 2003 amendment to the leasing agreement.   Given this, Hightower continued to operate his Subway in the mobile unit on MSU's campus.

On May 23, 2007, after receiving Hightower's notice of claim, MSU contacted Subway Real Estate Corporation via written letter and again attempted to negotiate Subway's return to Colvard Union in accordance with the October 2003 amendment.   MSU requested acceptance of the terms discussed in the letter by June 4, 2007.   The June 4, 2007 deadline appears to have passed without acceptance of the rental amount by either Subway Real Estate Corporation or Hightower and, on September 6, 2007, MSU informed Hightower that he must remove his mobile unit from the MSU campus by October 31, 2007.   Thereafter, Plaintiffs filed suit against MSU and, on December 19, 2007, Plaintiffs filed a motion for temporary restraining order and preliminary injunction in chancery court, which appears to have been later transferred to the circuit court.

In January 2008, MSU began proceedings in justice court to evict Hightower from the mobile unit.   After a hearing, the justice court issued an eviction order against Hightower in

---

[4] According to Plaintiffs, one of the reasons for this disagreement surrounded the fact that Hightower would allegedly not be able to use the new debit system, known as "Flex Dollars." The Court discusses this in more detail *infra*.

February 2008. Hightower appealed the order, and the circuit court subsequently entered an order granting MSU's request for a writ of removal on May 2, 2008. As such, Hightower removed the mobile unit several days after the circuit court's order. During the pendency of Plaintiffs' lawsuit against MSU—which is still ongoing in the in the Circuit Court of Okitibbeha County—Plaintiffs filed this action against Defendant Aramark for tortious interference of contract. Defendant has filed motion for summary judgment, arguing it is entitled to judgment as a matter of law on Plaintiffs' claim.

## LEGAL STANDARD

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323, 106 S. Ct. 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory

facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075.

## ANALYSIS AND DISCUSSION

Under Mississippi law, recovery for intentional interference with contract is only allowed against those who "intentionally and improperly interfere with the performance of a contract," while mere negligent interference is no cause of action at all. Morrison v. Miss. Enterprise for Tech. Inc., 798 So. 2d 567, 574 (Miss. 2001). The elements of tortious/intentional interference with contract are:

(1)     that the acts were intentional and willful;

(2)     that they were calculated to cause damage to the plaintiffs in their lawful business;

(3)     that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and

(4)     that actual damage and loss resulted.

Par Indus., Inc. v. Target Container Co., 708 So. 2d 44, 48 (Miss. 1998). With respect to the elements of willfulness and calculation, the court in Liston v. Home Ins. Co., explained that

> The element of willfulness and calculation does not require a showing on the part of the plaintiff that defendant had a specific intent to deprive plaintiff of contractual rights. Rather, the requisite intent is inferred when defendant knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or substantially certain will result in interference with the contract. Cranford v. Shelton, 378 So. 2d 652, 655 (Miss. 1980) (quoting Ramondo v. Pure Oil Co., 159 Pa. Super. 217, 48 A. 2d 156 (1946); RESTATEMENT (SECOND) OF TORTS § 766 (comment j). Once plaintiff has established a prima facie case of interference, the defendant may rebut with proof that his actions were either without knowledge of the existence of the contract, or were justified. Mid-Continent Telephone Corp. v. Home Telephone Co., 319 F. Supp. 1176, 1200 (N.D. Miss. 1970).

659 F. Supp. 276, 281 (S. D. Miss. 1986).[5] Further, in order to succeed on this claim, Plaintiffs "must prove that the contract would have been performed but for the alleged interference." Grice v. FedEX Ground Package Sys., Inc., 925 So. 2d 907, 910 (Miss. Ct. App. 2006).

In their complaint, Plaintiffs allege that Defendant "intentionally entered into a contract with MSU, whereby it would take over the property being leased by Plaintiff, with full knowledge of lease." Further, Plaintiffs assert that it was Defendant's "intent to interfere with that contract," and that Defendant's alleged interference with Plaintiffs' contract is the "sole and exclusive reason why Plaintiff was being prevented from returning to the [MSU] Student Union." After a thorough review of the record, the Court concludes that Plaintiffs cannot demonstrate that Defendant tortiously interfered with the leasing agreement between Hightower and MSU.

---

[5] In 1998, the Mississippi Supreme Court held that the Liston case was "instructive as it pertains to the element of intent." Par Indus., 708 So. 2d at 48.

Defendant, along with several other companies, responded to a request from MSU for proposals to provide management services for campus dining. As aptly set forth by Defendant, the timeline in this matter is important:

> ➢ In October 2005, MSU informed Hightower via written letter that it wished to terminated its leasing agreement effective April 1, 2006.
>
> Through this letter, MSU also informed Hightower that, in the event that MSU decided to re-bid for food court vendors, it "may" send Hightower an RFP.
>
> ➢ On November 6, 2006, MSU announced via a press release that it intended to utilize a management services company for its campus dining services.
>
> ➢ On November 13, 2006, MSU issued a **public** invitation to negotiate and requested that interested companies submit bids for the contract to provide management services.
>
> The invitation to negotiate does not mention Subway, either that it was currently in operation or that it would remain on campus.
>
> ➢ Aramark, **along with several other companies**, submitted proposals in response to the invitation to negotiate from MSU.
>
> ➢ In January 2007, MSU completed the process for evaluating proposals and selected Aramark's proposal.
>
> ➢ In February 2007, at Aramark and MSU's initial meeting to negotiate the terms of the management services contract, Aramark, **after** its proposal was selected by MSU, was first informed of Hightower's leasing agreement.[6]
>
> ➢ At this meeting, MSU asked Aramark how it would affect Aramark's proposal if Subway remained on campus.
>
> ➢ Aramark, in acknowledging that it would not profit from Subway's sales, noted that while it would affect the financial terms of its

---

[6] Bill Broyles learned of Subway's amendment to the leasing agreement in January 2007, shortly before MSU's February 2007 meeting with Aramark.

> proposal, it would **not** be a "deal breaker" for Subway to remain its operation on campus.

The evidence demonstrates that MSU was already considering the termination of Plaintiff's leasing agreement even prior to the public solicitation of proposals, thus also prior to Aramark responding to such proposals. Hightower admits as much in his deposition testimony:

> Q:     So November of 2006, you're realizing that MSU is not planning to let you return to [Colvard] Union?
>
> A:     Paul [Bisbee] told me they weren't going to.

Therefore, Hightower knew that MSU was considering the termination of his lease prior to Aramark's involvement in this action. In fact, Aramark did not learn of Hightower's lease until after it had responded to the invitation to negotiate and after its proposal was selected by MSU. Even beyond this, however, there is otherwise no evidence that Aramark induced MSU to breach Hightower's leasing agreement after learning of the lease.

"The nature of the actor's conduct is a chief factor in determining whether the conduct is improper or not, despite its harm to the other person." REST. 2D OF TORTS § 767 cmt. c. An illustrative example can be found in the Restatement (Second) of Torts: B is under contract to sell goods to C. B offers to sell them A, who knows of the contract. A accepts the offer and receives the goods. A has *not* induced the breach and is not subject to liability. REST. 2D OF TORTS § 766 cmt. n. Here, Plaintiffs have put forth no evidence of any active and improper solicitation by Aramark of MSU's business. Rather, the record evidence only demonstrates that Aramark responded to a public inquiry from MSU. Id. (noting that "A's active solicitation of B's business is more likely to make his interference improper than his mere response to an inquiry from B"). Aramark informed MSU that it had no objection to Subway

returning to Colvard Union. Certainly, responding to a public invitation to negotiate without knowledge of the prior leasing agreement and, upon learning of such an agreement, having no objection to it being performed does not amount to an "intermeddling" tort, see Morrison v. Miss. Enter. For Tech., Inc., 798 So. 2d 567, 575 (Miss. Ct. App. 2001), such as the one brought in this action.

Several Mississippi cases are instructive on this point. See McBride Consulting Service, LLC v. Waste Mgmt of Miss., 949 So. 2d 52, 56 (Miss. Ct. App. 2006) ("[S]everal Mississippi cases . . . have considered whether the defendant displayed 'bad acts exceeding the realm of legitimate competition' and whether the defendant's acts were committed without legal or social justification.") (citing to MBF Corp. v. Century Bus. Communications, Inc., 663 So. 2d 595 (Miss. 1995) and Par Industries, 708 So. 2d at 48). In MBF Corporation, the Mississippi Supreme Court was faced with an action for tortious interference with business relationships.[7] The court began by noting that "[c]ourts have recognized the right to engage in legitimate competition . . . It is proper to engage in competition for prospective gain, as long as tortious acts are not employed to further that gain." 663 So. 2d at 598 (citing PROSSER AND KEATON, THE LAW ON TORTS, § 130, 1012 (5th ed. 1984)). The Mississippi Supreme Court further made clear that it is "not a tort to fairly compete with a business rival

---

[7] This tort is "closely intertwined" with an action for tortious interference with contract. See McBride, 949 So. 2d at 56; MBF Corp., 663 So. 2d at 599 ("The tort of interference with business relations is closely aligned with that of interference with a contract."). While, by definition, the two torts may be distinguishable from one other depending on the tortious acts employed, in order to prove tortious interference with business relations, the plaintiff has to show the same type of elements as those needed to prove a tortious interference with contract claim. See MBF Corp., 663 So. 2d at 599. Thus, this Court finds the MBF Corporation case instructive in terms of demonstrating the type of acts that would be considered unlawful and beyond the realm of legitimate competition.

10

for a prospective customer. A competitor should feel free to acquire business for himself by fair and reasonable means." Id. (internal citations omitted). After noting this, and examining the defendant's actions in that case, the court concluded that the record revealed several instances in which defendant went far beyond the realm of legitimate competition. Id. The facts established that defendant's acts were intentional, willful, and calculated to cause damage to plaintiff's customer base and, in turn, to the entire business. Id. at 599. The defendant had intentionally and willfully taken files from the premises of MBF, as well as hired its two key salesmen and instructed these salesmen to copy customer files containing vital information while the salesmen were still employed at MBF. Id. In addition, defendant supplied the salesmen with defendant's purchase order invoices which were used to obtain orders on behalf of defendant from MBF customers. Id. Along the same lines, information was spread to MBF customers that MBF was closing its Jackson branch office. Id. The defendant's acts were not the result of justifiable purpose, but instead were clearly motivated by the unlawful purpose of causing damage or loss. Id. The record in the MBF Corporation case provides an example of the kind of acts that constitute a tortious interference claim—acts that are most certainly not present in this action.

The case of McBride Consulting Service is also instructive. There, the Court of Appeals of Mississippi held that the defendant did not act unlawfully by offering lower rates to consumers who negotiated directly instead of through a broker. McBride, 949 So. 2d at 52. As background, McBride Consulting is a waste broker that would enter into at will contracts with small businesses to serve as their exclusive agent for the negotiation of waste disposal contracts. McBride would then negotiate with a third party waste disposal company a

collective price for the waste disposal of its clients, and McBride would serve as paying agent for its clients. McBride made its money from the cost savings obtained for its clients by this collective negotiation. Waste Management was a third party waste disposer with whom McBride negotiated waste disposal for its clients. McBride apparently worked aggressively to grow its business, and this included making contracts with businesses for whom Waste Management was already the contracted waste disposer. Apparently recognizing that waste brokers were a growing group, Waste Management adopted a national policy which required that (1) the rates to be charged to waste brokers be established by the regional office, (2) these rates be in upper tiers of the rate scales, and (3) the waste brokers sign a standard contract. The policy mandated that if a broker declined to execute the standard contract, then Waste Management would not do business with him. McBride refused to execute the standard contract.

At some point in the process, Waste Management became concerned that its relationship with McBride was less than satisfactory. Among the concerns expressed by Waste Management were (1) the refusal of McBride to sign the standard contract and (2) its perception that McBride was tardy in the payment of the invoices sent to it. To address these concerns, Waste Management undertook a series of aggressive actions, including offering to individual businesses lower prices than those prices which it was willing to give to McBride. Waste Management made clear that these lower rates were only available to customers who dealt directly with it. As a result of the lower rates offered directly by Waste Management, a number of McBride's clients chose to contract directly with Waste Management rather than have their needs brokered by McBride. McBride filed suit against Waste Management for (1)

intentional interference with a contractual relations and (2) intentional interference with business relationships. At the conclusion of McBride's case-in-chief, the trial court, finding insufficient evidence to submit the matter to the jury, entered judgment for the defendants.

The court of appeals affirmed the trial court. The <u>McBride</u> court's opinion began in a similar fashion as the <u>MBF Corporation</u> court's, noting that,

> The aggressive marketing of a company's products or services, of necessity, is intended to impact the business of competitors by the increase in its market share and the decrease in the earnings potential of those others operating in the same sphere. Such actions in and of themselves *are lawful, and without more, do not give rise to a cause of action*.

949 So. 2d at 56 (emphasis added). The court of appeals went on to find as follows:

> There was evidence presented from which it might be concluded that some contracts between McBride and its clients were terminated because Waste Management offered lower rates to these businesses. These were rates which Waste Management refused to extend to McBride. Waste Management says that its efforts were justified and legal because they were intended to keep its customers and increase its revenues. The effort to increase profitability, without more is not improper. However, the effort may be conducted under circumstances which render it improper, and therefore actionable. <u>Cenac v. Murry</u>, 609 So. 2d 1257, 1269 (Miss. 1992) (citing <u>Wesley v. Native Lumber Co.</u>, 97 Miss. 814, 820, 53 So. 346, 347 (1910)). Likewise, the refusal of Waste Management to extend to a waste broker the same or lesser rates than those given to direct customers is not per se improper. <u>Wertz v. Ingalls Shipbuilding, Inc.</u>, 790 So. 2d 841, 848(¶ 27) (Miss. Ct. App. 2000) (citing Restatement (Second) of Torts § 766 (1977)). Nor has McBride produced evidence of actions by Waste Management which were unlawful. Without proof of some improper action by Waste management, McBride's claim must fail.

<u>Id.</u> Thus, the court concluded that "aggressive[ness] in the pursuit of business," even when "described as playing hardball," is "not illegal." <u>Id.</u> Here, the record is void of any type of

evidence even similar to that engaged in by the parties in <u>McBride</u>, a case in which the court found the tortious interference claim to fail.

In their response in opposition to summary judgment, Plaintiffs do not appear to contest many of the underlying facts in this action, or the timeline of events. Rather, unlike what appears to be alleged in their complaint, Plaintiffs raise two separate, yet interrelated, arguments: the first relating to MSU's debit systems and the second involving alleged antitrust violations. The Court begins by first providing background of MSU's debit systems.

The student debit systems at issue are "Money Mate" and "Flex Dollars." The Money Mate program appears to be comparable to a prepaid debit card system that students may use to purchase a myriad of items, including food on and off campus, books, and medical services at the Student Health Center. The MSU Flex Dollars program is similar to Money Mate, as it is a prepaid debit card system; however, unlike Money Mate, Flex Dollars appears to only be used to purchase food at on-campus facilities. In an attempt to meet the element of "malice" necessary to support a tortious interference claim, Plaintiffs assert that Defendant wrongfully interfered with its continued access to the aforementioned MSU debit systems. Hightower asserts that Money Mate was approximately forty percent of his total sales. According to Hightower, he was informed at the February 2007 meeting that the debit system was going to be altered, and that the new debit system, Flex Dollars, would only be used by Defendant Aramark. According to Plaintiffs, tortious interference exists because only Aramark could use the new Flex Dollars system. The Court concludes that Plaintiffs' argument fails for several reasons.

To begin with, there is no evidence in the record, either from deposition testimony or the leasing agreement itself, which demonstrates that Hightower ever had a contractual right to participate in either the Money Mate or Flex Dollars systems. See Hennessey v. Nat'l Collegiate Athletic Ass'n, 564 F.2d 1136, 1143 (5th Cir. 1977) ("Ordinarily, such a claim must be premised upon a valid contract. . . ."). In fact, by Plaintiffs' own admission, Flex Dollars is a *new* debit system at MSU—one apparently not even in existence when Hightower's contract was entered into. If Hightower had no contract with MSU to utilize either debit system, it logically follows that Aramark could not tortiously (or otherwise) interfere with such a nonexistent agreement. Even beyond this, however, there is no evidence that Aramark used the Flex Dollars system as method of inducing MSU to terminate its leasing agreement with Hightower. As noted *supra*, MSU informed Hightower—prior to Aramark submitting its proposal—that it wished to terminate Hightower's leasing agreement. Further, Plaintiffs have presented no evidence that Aramark played *any* role in the decision made by MSU to exclude Subway from the Flex Dollars program. In fact, the record demonstrates just the opposite. Bill Broyles, MSU's Vice President of Student Affairs, testified as follows:

> Q: Did y'all discuss with Aramark the possibility of allowing Mr. Hightower to accept the Flex Dollars?
>
> A: No. We discussed with Aramark the possibility of Mr. Hightower coming back on campus.
>
> Q: Okay. Did you ever bring up to Mr. Nelson [of Aramark] the possibility of Subway being allowed to accept the Flex Dollars and how that could work?
>
> A: No, I didn't.

15

Q:      Okay. Why didn't you?

A:      Didn't think about it.

Thus, MSU concedes that it did not even consult Aramark about Subway being, or not being, allowed to use Flex Dollars.

While Plaintiffs contend that "Hightower could not compete with Aramark's restaurants *when MSU was forcing* the entire freshman population to make their purchases of meals from Aramark by paying in advance for their meals [i.e., using Flex Dollars], which could only be used at an Aramark restaurant," this argument, like the majority of allegations in Plaintiffs' brief in opposition, couches the alleged "wrongdoing" in terms of actions by MSU.[8] Along the same lines, while Hightower avers that he could not utilize the Flex Dollars program (again, a program Hightower had no contractual right to utilize), the Court has methodically mined the record and found no evidence that Hightower would have been excluded from continuing to utilize MSU's Money Mate program. The Money Mate program appears to exist in conjunction with Flex Dollars, and Money Mate comprised, according to Hightower, forty percent of Hightower's total sales.

Plaintiffs additionally advance an argument grounded in antitrust law as an attempt to demonstrate that Defendant acted with malice when entering its agreement with MSU. At the outset, and before addressing Plaintiffs' antitrust allegations, the Court notes that many of Plaintiffs' arguments appear to put the proverbial cart before the horse. That is, several of

---

[8] In fact, if portions of Plaintiffs' brief were read in isolation, it would initially appear that the lawsuit is actually against MSU – not Aramark. For example, Plaintiffs assert that "*MSU* was willing to grant an exclusive contract to Aramark, *despite MSU's preexisting lease* with Hightower because *it* [i.e., *MSU*] expected to make about $12,000,000.00 over ten years from Aramark." (Emphasis added). This statement confers no malicious intent on Aramark.

16

Plaintiffs' arguments focus only on the actual contract between Aramark and MSU and, whether under the law, the contract itself is proper without *first* establishing that Aramark— the Defendant in this action—actually wrongfully "interfered" (i.e., the claim asserted is indeed one for tortious *interference*, not one for antitrust violations) with Hightower's leasing agreement, or otherwise caused or induced MSU to terminate that agreement.[9]  By way of example:

> Assume that A has a contract with B, and A writes to B saying it wishes to terminate its contract with B.  Then, a year later, C responds to a public solicitation from A without knowledge of A's preexisting agreement with B.

> Even if the contract that A and C subsequently enter into is void or voidable due to some federal or state regulation, it would not automatically mean that C "tortiously interfered" with A and B's preexisting contract solely because of the potential unlawfulness of A and C's current contract.  B would still have to demonstrate the elements of tortious interference, which include a showing that C's actions were "calculated" to cause damage to B.

If Aramark did not "interfere" with MSU and Hightower's leasing agreement (i.e., if Plaintiffs cannot prove that the contract would have been performed but for the alleged interference from Aramark), then even if Aramark's contract with MSU violates some provision of the Sherman Act, it would appear that such a violation would be irrelevant *to the tortious interference claim*.

---

[9] Stated more simply, it does not automatically flow from MSU's alleged breach of its agreement with Hightower that the company to now obtain a contract with MSU caused, or otherwise induced, that alleged breach.  Proof of tortious interference or some type of unlawful inducement still must be shown.  See Morrison v. Miss. Enter. For Tech., Inc., 798 So. 2d 567, 575 (Miss. Ct. App. 2001) ("Tortious interference is based on intermeddling – a tort occurs if without sufficient reason, one person intentionally interferes with another's contract even if the interference is by giving information that is completely accurate, when the *purpose was to cause interference* and injury results.") (emphasis added).

As noted above, it is undisputed that MSU sought to terminate Hightower's leasing agreement in 2005. Specifically, on October 31, 2005, the Director of Procurement and Contracts for MSU sent Hightower and Subway Real Estate Corporation a written letter stating,

> Due to impending renovation of the Colvard Union, Mississippi State University *wishes to terminate its contract with your company* effective April 1, 2006. If you are interested in a temporary location while renovations are in process, please contact me within thirty days. Also, please provide contact information so that we may send you an RFP in the event that we decide to re-bid for food court vendors.

Over a year after MSU informed Hightower that it wished to terminate his leasing agreement, MSU issued its public invitation to negotiate. Without knowledge of Hightower's leasing agreement, Aramark merely responded to this pubic invitation. Aramark was only one of several companies to respond to this public request. Thus, even if Aramark's proposal would not have been selected by MSU, another company's would have been, and that other company would presumably then be the target defendant in this action. Given this, it is hard to qualify *Aramark's* response to MSU's public invitation as *the* "but for" cause of Hightower's leasing agreement being terminated. That is, if merely responding to a public invitation to negotiate is the initial action by Aramark that, under Plaintiffs' theory, subjects it to liability for tortious interference, then it would follow that every other company who responded, yet was not selected, would also be liable. However, such is not the case.

Yet, because the Restatement (Second) of Torts § 767 briefly mentions antitrust violations in terms of a way to show that the alleged interference was improper, the Court will squarely address Plaintiffs' Sherman Act arguments. Specifically, the Restatement states as follows,

18

Unlawful conduct. Conduct *specifically* in violation of statutory provisions or contrary to *established* public policy may for that reason make an interference improper. This may be true, for example, of conduct that is in violation of antitrust provisions or is in restraint of trade or of conduct that is in violation of statutes, regulations, or judicial or administrative holdings regarding labor relations.

REST. 2D OF TORTS § 767 cmt. c. (emphasis added). According to Plaintiffs, "[a]n agreement that one may not be a freshman student at MSU unless he or she pays for food from a single vendor (Aramark) is a plainly anti-competitive tying agreement which has been held to violate public policy in other contexts."[10] Plaintiffs maintain that the contract is unlawful under both the Sherman Act as well as Mississippi antitrust statutes.

---

[10] Plaintiffs' brief also states, "According to the evidentiary materials, Aramark specified that Hightower, if he were to continue his lease on campus, could not utilize this new debit system." Plaintiffs further state, "the evidentiary materials have established that Aramark would allow an exception to its exclusive food contract with MSU only if Hightower were excluded from using the debit system (Flex Dollars). . . ."

The Court is unsure as to what evidentiary materials Plaintiffs refer to. In fact, Plaintiffs fail to even cite to a portion of the record to support such assertions. See Williams v. Valenti, 432 F. App'x 298, 303 (5th Cir. 2011) (noting that the district court is "not required to search the record in support of evidence supporting a party's opposition to summary judgment"). As Defendant notes, Plaintiffs appear to be misconstruing the record evidence in an attempt to create the (mis)impression that Aramark mandated Subway's exclusion from the debit program. Plaintiffs do this by wrongfully imputing statements by MSU officials, specifically Bill Broyles, to Defendant Aramark. Specifically, it was Bill Broyles of MSU, not Aramark, that stated, "We told him [Hightower] . . . that he could not accept the Flex Dollars for meal purchases." Dep. of Broyles at 23. Further, as noted above, Broyles also testified as follows:

Q: Did y'all discuss with Aramark the possibility of allowing Mr. Hightower to accept the Flex Dollars?

A: No. We discussed with Aramark the possibility of Mr. Hightower coming back on campus.

Q: Okay. Did you ever bring up to Mr. Nelson [of Aramark] the possibility of Subway being allowed to accept the Flex Dollars and how that could work?

A: No, I didn't.

Q: Okay. Why didn't you?

Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Taken literally, the applicability of § 1 to "every contract, combination . . . or conspiracy" could be understood to cover every conceivable agreement, whether it be a group of competing firms fixing prices or a single firm's chief executive telling her subordinate how to price their company's product. But even though, if "read literally," § 1 would address "the entire body of private contract," that is not what the statute means. See Nat'l Soc. of Professional Engineers v. United States, 435 U.S. 679, 688, 98 S .Ct. 1355, 55 L. Ed. 2d 637 (1978); Texaco Inc. v. Dagher, 547 U.S. 1, 5, 126 S. Ct. 1276, 164 L. Ed. 2d 1 (2006) ("This Court has not taken a literal approach to this language"); cf. Bd. of Trade of Chicago v. United States, 246 U.S. 231, 238, 38 S. Ct. 242, 62 L. Ed. 683 (1918) (reasoning that the term "restraint of trade" in § 1 cannot possibly refer to any restraint on competition because "[e]very agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence") Not every instance of cooperation between two people is a potential "contract, combination . . ., or conspiracy, in restraint of trade." 15 U.S.C. § 1.

The meaning of the term "contract, combination . . . or conspiracy" is informed by the "'basic distinction'" in the Sherman Act "'between concerted and independent action'" that distinguishes § 1 of the Sherman Act from § 2. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984) (quoting Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)).

---

A:      Didn't think about it.
Dep. of Broyles. at 39 – 42.

Section 1 applies only to concerted action that restrains trade. Section 2, by contrast, covers both concerted and independent action, but only if that action "monopolize[s]," see 15 U.S.C. § 2, or "threatens actual monopolization," see Copperweld, 467 U.S. at 767, 104 S. Ct. 2731, a category that is narrower than restraint of trade. Monopoly power may be equally harmful whether it is the product of joint action or individual action.

In Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1953), the Supreme Court defined a tying arrangement as: "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product . . . ." 356 U.S. at 5, 78 S. Ct. 514. Tying agreements "deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market." Id. at 6, 78 S. Ct. 514. An illegal tying arrangement has four basic characteristics: (1) two separate products (the tying and the tied product); (2) sufficient economic power in the tying market to coerce purchase of the tied product; (3) involvement of a not insubstantial amount of interstate commerce in the tied market; and (4) anticompetitive effects in the tied market. Driskill v. Dallas Cowboys Football Club, Inc., 498 F.2d 321 (5th Cir. 1974); see also Yentsch v. Texaco, Inc., 630 F.2d 46 (2d Cir. 1980) (noting that to state a claim for an illegal tie, a plaintiff must allege "five specific elements: first, a tying and a tied product; second, evidence of actual coercion by the seller that in fact forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, involvement of a 'not insubstantial' amount of interstate commerce in the tied market.").

The Supreme Court "ha[s] condemned tying arrangements when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 13–14, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984). The market must be defined so as "to include all reasonable substitutes for the product." Id. at 37–38, n.7, 104 S. Ct. 1551 (O'Connor, J. concurring). One way a seller can achieve market power or "appreciable economic power" is by producing a unique product, which has little or no competition from functionally similar products or services. See Lee v. Life Ins. Co. of N. Am., 23 F.3d 14, 16 (1st Cir. 1994), cert. denied, 513 U.S. 964, 115 S. Ct. 427, 130 L. Ed. 2d 340 (1994). Consumer preference for a "brand name alone does not establish product 'uniqueness' necessary for [appreciable economic power]." Id. at 17.

Courts have routinely rejected Sherman Act challenges such as the one Plaintiffs attempt to bring in this action. For example, in Lee, the First Circuit held that the University of Rhode Island's ("URI") policy to condition semester registration upon the payment of a fee for use of the on-campus health clinic was not an illegal tying arrangement. Id. at 15. The university required full-time undergraduate students to pay the health clinic fee. Id. In order to use the clinic, students were also required to carry supplemental insurance. The university offered supplemental insurance through "a private health care underwriter, which URI sponsor[ed] as its 'default' insurer." Id. The plaintiffs alleged that "conditioning continued matriculation at URI on payment of the . . . clinic fee and/or the . . . supplemental insurance premium" was an illegal tying arrangement. Id.

22

The court explained that "URI obviously is a 'unique' institution in a colloquial sense, [however, the] appellants cannot claim that other institutions of higher education do not or cannot provide 'functionally similar' educational offerings to potential URI applicants." Id. at 17. Therefore, the court held that the plaintiffs had failed to state a claim that URI possessed appreciable economic power "in the tying market for a university education." Id.

Similarly, the court in Hack v. President and Fellows of Yale College, 16 F. Supp. 2d 183 (D. Conn. 1998), *aff'd*, 237 F.3d 81 (2d Cir. 1999) addressed an action for damages and injunctive relief brought by freshman and sophomore students at Yale College claiming that the defendants had denied them permission to reside off campus. The antitrust claim was based on the school's mandated housing program, and defendants argued that the complaint failed to sufficiently alleged that Yale obtained the requisite economic market power to make the tying agreement illegal under 15 U.S.C. § 1. The plaintiffs argued that, because their complaint alleged that a Yale education was unique, they had sufficiently stated their tying claim. In response to this argument, the court noted that, with respect to the uniqueness of a product, the Supreme Court has explained that "the question is whether the seller has some advantage not shared by his competitors in the market for the tying product. Without any such advantage differentiating his product from that of his competitors, the seller's product does not have the kind of uniqueness considered relevant in prior tying-clause cases." United States Steel Corp. v. Fortner Enterprises, Inc., 429 U.S. 610, 620–21, 97 S. Ct. 861, 51 L. Ed. 2d 80 (1977) (Fortner II). Applying the Supreme Court's logic to the case before it, the court reasoned that plaintiffs' complaint "fail[ed] to sufficiently allege that Yale has the requisite economic market power in the tying product market—in either the broader university

education market or the narrower Ivy League education market—to coerce the plaintiffs to accept the tied-product[:] residence hall accommodations." Hack, 16 F. Supp. 2d at 195.

Along the same lines as discussed in Lee and Hack, courts have also uniformly rejected claims under Section Two of the Sherman Act. To state a claim for monopolization under § 2 of the Sherman Act, a plaintiff must allege "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 481, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992) (quoting United States v. Grinnel Corp., 384 U.S. 563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966)). Monopoly power is defined as "the power to control prices or exclude competition . . . and is also referred to as a high degree of market power[.]" Id. (internal quotation marks and citation omitted). To succeed on their claims, plaintiffs must show that defendants have "engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power." Id. at 226-27 (citing PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 108 (2d Cir. 2002)). As a prerequisite to any antitrust claim, the plaintiff must allege a relevant market in which the anticompetitive effects of the challenged activity can be assessed. See Geddie v. Seaton, 2006 WL 2263335, at *5 (N.D. Tex. Aug. 8, 2006). "Without a definition of the relevant market, there is no way to measure a company's ability to act as a monopolist." United States v. Eastman Kodak Co., 63 F.3d 95, 104 (2d Cir. 1995). A relevant market is comprised of a market for the specific product at issue, the market for reasonably interchangeable products, and a geographic market, the area in which sellers of the relevant

product effectively compete. See United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S. Ct. 994, 100 L. Ed. 1264 (1956).

For example, in Delta Kappa Epsilon (DEK) Alumni Corp. v. Colgate University, 492 F. Supp. 2d 106 (N.D.N.Y. 2007), the court addressed and rejected a monopolization claim under Section Two of the Sherman Act based on the university required housing program. The Delta Kappa Epsilon court noted,

> Here, Colgate and its students enter into a unique contractual arrangement which governs both parties' conduct during the tenure of their relationship. It is undisputed that "a number of colleges with which [Colgate] competes to enroll high school graduates provide functionally similar educational offerings and have the potential to take significant numbers of students away from [Colgate]." Hamilton, 106 F. Supp. 2d at 412. In fact, just as colleges are competing with their peers to enroll the best applicants, high school students also face tough competition in seeking admittance into a highly select college like Colgate. Once potential Colgate students receive their offers of admission, they compare and contrast their options, weighing a cluster of factors, such as academic reputation, location, sporting facilities, and student diversity. Indeed, students may consider housing among other factors in ultimately choosing a college.
>
> Once a student decides to enroll in a particular college, a unique and distinctive relationship commences between school and student that governs that student's four-year tenure. Over the next four years, an undergraduate student lives and studies in a "quasi-parented" environment, where the school, in loco parentis, creates and enforces policies for the protection and welfare of its students. Here, Colgate has exercised these rights, namely, its "parietal" rights, see Hack, 237 F.3d at 85, in creating a residential policy that is part of a Colgate education. As such, the court holds, as a matter of law, that Colgate's residential policy is an effect of the exercise of its lawful and appropriate parietal rights.

Id. at 117 (brackets in original). Similarly, the Second Circuit on appeal in Hack v. President & Fellows of Yale College, 237 F.3d 81, 85 (2d Cir. 2000) explained that "[e]conomic power derived from contractual arrangements affecting a distinct class of consumers cannot serve as a basis for a monopolization claim." Moreover, the Circuit observed,

> if a parietal rule requiring some students to reside in college or university housing runs afoul of the antitrust laws, it has largely escaped the notice of the many colleges and universities across the country that have had and continue to have those rules and the notice of the millions of students who have attended those institutions in the more than a century since the Sherman Act was enacted.

Id.; see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 106 F. Supp. 2d 406, 413 (N.D.N.Y. 2000) (rejecting monopolization challenge to college's required housing and meal programs and finding that "[s]tudents do not – indeed cannot – shop separately for individual college services or characteristics, but rather must select one college which offers a group of services and qualities"); E. Food. Servs. v. Ponticial Catholic Univ. Ass'n, Inc., 357 F.3d 1, 8-9 (1st Cir. 2004) (rejecting exclusive-dealing challenge to university's selection of suppliers for campus vending machines).

While Plaintiffs in the case *sub judice* attempt to satisfy the "malice" element of their tortious interference claim by alleging violations of antitrust provisions, Plaintiffs fail to cite to a single case, or any other authority, that has found analogous university programs to run afoul of such antitrust laws. In fact, Plaintiffs do nothing more than make a blanket statement that the contract is unlawful; Plaintiffs' brief is entirely void of the analysis needed to mount an argument that Defendant has acted contrary to the Sherman Act or comparable Mississippi statutes. Accordingly, Plaintiffs have failed to establish the element of malice necessary to support a claim for tortious interference. Plaintiffs have further failed to establish that any of Defendant Aramark's actions were willfully and intentionally calculated to cause damage to Plaintiffs or that Hightower's leasing agreement would have been performed but for Aramark's alleged interference.

## **CONCLUSION**

26

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED.

So ordered on this, the _9th__ day of ___March_____, 2012.

/s/   **Sharion Aycock**_____
**UNITED STATES DISTRICT JUDGE**